**EXHIBIT A**

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

NATIONAL CAPITAL :
REVITALIZATION CORPORATION, :
                    Plaintiff, :
                                 :
                                 :
            v.                   :    Civil Action No. 05-0005335
                                 :
                                 :
0.03 ACRES OF LAND IN            :    Judge Geoffrey M. Alprin
THE DISTRICT OF COLUMBIA         :
(2834 Alabama Avenue, S.E.)      :
                                 :    ACTION INVOLVING REAL PROPERTY
and                              :
                                 :
                                 :
SAMUEL N. FRANCO                 :
2834 Alabama Avenue, S.E.        :
Washington, D.C. 20020, et. al., :
                    Defendants.  :

ANSWER AND COUNTERCLAIM OF DEFENDANT SAMUEL N. FRANCO
TO AMENDED COMPLAINT

Defendant Samuel N. Franco ("Franco"), by his attorney herein, alleges as his answer to

the amended complaint of plaintiff National Capitalization Revitalization Corporation ("NCRC")

as follows:

Defendant Franco is the owner in fee simple of the Property as defined in the amended

complaint, being the real property, consisting of approximately 0.03 acres of land with the

improvements thereon and appurtenances thereto, located at 2838 Alabama Avenue, S.E.,

Washington, DC 20020, identified as Parcel 214/88 on the records of the Assessor of the District

of Columbia.

Defendant Franco answers the specific allegations of amended complaint as follows:

1. Admits the accuracy of the quoted provisions of Sec. 2-1219.02 of The National

Capital Revitalization Corporation Act of 1998, as amended, D.C. Code Sec. 2-1219.01 et

seq.(2005) (the "NCRC Act") in paragraph 1 of the amended complaint, but refers the Court to

the full test of said section of the NCRC Act for the exact terms, purposes and conditions thereof.

2. Admits the accuracy of the quoted portion of Sec. 2-1219.19(a) of the NCRC Act as alleged in the first sentence of paragraph 2 of the amended complaint, but denies the rest of the allegations in said sentence, but refers the Court to said section of the NCRC Act for the terms thereof. Admits that the Council of the District of Columbia (the "Council") purportedly authorized NCRC to exercise eminent domain to acquire the property that is the subject of this condemnation action in Sec. 2-1219.19(c)(1) of the NCRC Act as alleged in the second sentence of paragraph 2 of the amended complaint, but denies that said provision of the NCRC Act and the enactment thereof are valid.

3. Admits the allegations in paragraphs 3 and 4 of the amended complaint.

4. Denies the allegations in paragraphs 5 and 6 of the amended complaint.

5. Denies knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 7 of the amended complaint, and therefore denies said allegations.

6. Admits the allegations in paragraphs 8 and 9 of the amended complaint.

7. Denies the allegations in paragraphs 10 and 11 of the amended complaint.

8. Denies knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 12 of the amended complaint, and therefore denies said allegations.

9. Denies the allegations in paragraphs 13, 14 and 15 of the amended complaint.

10. Admits that the Council purportedly approved and authorized the exercise of eminent domain, but denies that said approval and authorization was lawful or valid under the United States Constitution or the laws of the District of Columbia as alleged in paragraph 16.

11. Admits the allegations in paragraph 17 of the amended complaint.

12. Denies the allegations in paragraph 18 of the amended complaint and refers the Court to the alleged letter for the exact terms thereof.

13. Denies the allegations.in paragraph 19 of the amended complaint.

14. Repeats the allegations in paragraphs 1 through 12 of this answer in response to the allegations in paragraph 20 of the amended complaint.

15. Denies the allegations in paragraphs 21, 22, 23, 24 and 25 of the amended complaint.

16. Denies the allegations in paragraph 26 of the amended complaint, except admits that defendant Franco has refused to sell the Property.

### FIRST DEFENSE

17. The legislation allegedly authorizing NCRC to acquire defendant Franco's Property by condemnation violates the Takings Clause of the Fifth Amendment of the United States Constitution in that it would authorize the taking of said property for a private use and not for a public use or purpose by, among other things, having as its purpose conferring a private benefit on a particular private party, stating pretextually a public purpose but having as its actual purpose bestowing a private benefit, having an illegitimate purpose of taking the Skyland Site from its owners and transferring it to a private party without any comprehensive or other development plan for the Skyland Site or its surrounding community or area to achieve any valid public purpose having been prepared, considered or approved by the Council, and resulting in a private one-to-one transaction.

### SECOND DEFENSE

18. The legislation enacted to authorize the taking of the Skyland Site as defined in the amended complaint was enacted and is being enforced in violation of the due process clause of

3

the Fifth Amendment of the U.S. Constitution.

THIRD DEFENSE

19.  This condemnation action violates D.C. Code Sec. 16-1311 (2005), as amended, in

that, among other things, defendant Franco's property, alone, and the Skyland Site, cumulatively,

are not needed for an authorized municipal use or any other lawful public use or public purpose.

FOURTH DEFENSE

20.  The legislation enacted authorize said taking was enacted in violation of D.C. Code

Sec. 1-204.04 and Rule 422 of the Rules of the Council for Council Period XV in that prior to

enacting said legislation the Council and one or more of its committees impermissibly

substantially amended B15-752 without public notice and without conducting a public hearings

or affording the public an opportunity to review and comment on said amendments before their

adoption and before the enactment of such legislation.

FOURTH DEFENSE

21.  The legislation was enacted in violation of D.C. Code Sec. 1-204.12 in that the

Council impermissibly enacted parts of such legislation as emergency and temporary legislation.

SIXTH DEFENSE

22.  The legislation was enacted in violation of Rules 412 and 413 of the Council in that

no emergency existed and the Council declared two successive identical emergencies to forestall

review of the legislation while it was being performed by plaintiff NCRC.

SEVENTH DEFENSE

23. The complaint fails to state a claim upon which relief can be granted.

## FIRST COUNTERCLAIM

(Taking In Violation of the Takings Clause Public Use Provisions
of the Fifth Amendment of the U.S. Constitution)

24. Defendant-counterplaintiff Franco is an adult citizens of the State of Maryland and a lessee of certain improved real property located at 2834 Alabama Avenue, SE, Washington, DC 20020 under a valuable lease that, with renewal option, has a remaining term of more than 5 years (the "Leased Property"). In addition, Franco is the owner of the Property, which is adjacent to and is used by him in common with Leased Property (collectively the "Combined Property"). The combined property is located in the Skyland Site.

25. Franco owns and operates a retail discount store covering about 22,000 sq. ft. of floor area, the entire enclosed area of the Combined Property, known as Discount Mart, through a corporation, D Mart, Inc., of which he is the sole shareholder and beneficial owner. Franco has operated his business at the Skyland Site continuously since 1976.

26. The District of Columbia ("D.C.") is a municipal corporation which is the government of the District of Columbia. At all relevant times herein, D.C. has acted both in its executive capacity, including the Mayor of the District of Columbia (the "Mayor"), his agents, and departments, agencies and entities under his authority, and in its legislative capacity represented by the Council.

27. Franco brings this counterclaim for a declaratory judgment and injunctive and other relief and damages against plaintiff-counterdefendant NCRC who seek to acquire Franco's Property and the Combined Property by eminent domain for a private use in violation of Franco's rights under the Fifth Amendment of the United States Constitution.

5

28. In about September, 2002, NCRC entered into a written joint development agreement (the "JDA") with a private developer comprised of The Rappaport Companies, Harrison-Malone Development, LLC, Marshall Heights Community Development Organization, Inc. and Washington East Foundation, Inc. (the "Redeveloper") to redevelop the approximately 11.5 acres of real property (including Franco's Property) in the Skyland Center plus an additional approximately 5 acres of vacant undeveloped residential zone land, separately owned and separate from but adjacent to the Skyland Center (the "Skyland Addition") (collectively with the Skyland Center the "Skyland Site").

29. The JDA provided that NCRC would share in the profits of such redevelopment and called for various actions to be taken by the Redeveloper as well as by D.C. and NCRC. In performance of the JDA, D.C. and NCRC have caused the Council to enact a series of legislative acts that would authorize NCRC to acquire the Skyland Site by eminent domain. NCRC's sole objective in this intended acquisition is to perform its undertakings under the JDA and to assemble and consolidate ownership of the Skyland Site in NCRC, displace all of the approximately 25 current businesses in the Skyland Center, and then sell the Skyland Site to the Redeveloper who would demolish all of the improvements, and clear the site for redevelopment, and design and build a new shopping center on the site for his own account (collectively the "Skyland Project").

30. In taking their actions complained of herein, D.C. and NCRC, jointly and severally have acted under color of law within the meaning of 42 U.S.C. § 1983 and are responsible for the deprivation of Franco's constitutional rights under the Fifth Amendment of the U.S. Constitution.

31. At all times relevant to this action, D.C. acted solely in a governmental capacity

6

under color of law by (i) drafting, funding, urging and otherwise facilitating the enactment of the legislation described in this complaint hereafter, (ii) implementing and facilitating through legislation enacted by the Council, (iii) entering into and performing agreements, including providing funds, and (iv) taking other executive action for the purpose of the unconstitutional taking of property and carrying out the Skyland Project, as alleged herein.

32.  At all relevant times, NCRC has acted in a governmental capacity under color of law, in (i) participating in and promoting the Skyland Project and selecting the Redeveloper to carry it out, (ii) promoting, urging and otherwise facilitating the enactment of the legislation described in this complaint designed to facilitate the unconstitutional takings of the Skyland Site and the carrying out of the Skyland Project alleged hereafter, (iii) proceeding to implement or execute a sustained program of acquiring said real property under the threat of an unconstitutional taking by eminent domain, and (iv) carrying out the Skyland Project.

33.  The Skyland Center is an approximately 11.5 acre shopping center located at the intersection of Alabama Avenue, Good Hope Road, and Naylor Road, S.E. in the District of Columbia.  Upon information and belief, the Skyland  Center is comprised of a number of contiguous separately owned parcels, has been continuously in operation for more than fifty years, has been fully leased for at least the last five years, and many of the approximately 25 business tenants have long-term leases. The present tenants include regional and national retailers, such as CVS Pharmacy and Autozone Auto Supplies, as well as a variety of neighborhood businesses, such as a supermarket, a general merchandise discount store, and beauty care, food, liquor and music stores, and serve the day to day retail needs of the community.  In addition, at all relevant times the U.S. Postal Service has operated the Anacostia

7

Post Office at the Skyland Center and D.C. has provided and now provides certain municipal employment services in facilities they each lease at the Skyland Center.

34. Upon information and belief, at all relevant times the Skyland Center and all of the business properties located thereon have been and now are substantially in compliance with applicable laws and regulations, including, among other things, applicable building and health codes, and the Skyland Center is not (and is not located in) a slum area, blighted area, redevelopment area or project area or other area eligible to be taken by eminent domain within the meaning of or under the authority of the NCRC Act or any other District of Columbia law or regulation.

35. Upon information and belief, the 5 acre Skyland Addition has never been part of the Skyland Center, has no functional relationship to it, and is not (and is not located in) a slum area, blighted area, redevelopment area or project area or other area eligible to be taken by eminent domain within the meaning of or under the authority of the NCRC Act or any other District of Columbia law or regulation. Upon information and belief, NCRC and D.C. have included the Skyland Addition in the Skyland Site and the Skyland Project at the behest of community activist solely in an attempt to provide enough parking space anticipated to be needed by the redeveloper to make the Skyland Project, a private use, feasible. Upon information and belief, the Skyland Project is not feasible.

36. Franco has suffered and will continue to suffer substantial injury to his constitutionally protected property, being his leasehold and ownership interests in the Combined Property. Said injury is proximately caused by the origination, enactment, as well as the application to Franco and his Property and the Combined Property of certain legislation of D.C.

8

and NCRC's and D.C.'s actions related thereto in originating and carrying out the Skyland

Project as alleged herein, including the commencement of this action.

37. The legislation in question is a series of related enacted bills concerning the Skyland

Site (collectively the "Skyland Legislation"). The enactment, application and implementation of

this legislation is unconstitutional and unlawful in at least the following respects:

(a) the legislation would unconstitutionally take Franco's Property in particular and the

Skyland Site generally for a private use, the Skyland Project, and not for a public use;

(b) the permanent portion of the legislation contains false and pretextual findings and was

enacted in violation of the D.C. Home Rule Act and the Council rules thereunder and would

unconstitutionally deprive Franco of his Property without due process of law;

(c) the legislation does not state the public purpose or use for which Franco's Property or

any of the Skyland Site is to be taken and is unconstitutionally vague; and

(d) the legislation was enacted as emergency and temporary legislation in violation of the

D.C. Home Rule Act, D.C. Code Sec.1-204.12 and in violation of Council rules.

38. D.C. and NCRC have taken and are threatening to take the actions referred to in

paragraph 37 above wrongfully, and are thereby depriving Franco of his constitutional rights and

his interests in the Property and the Combined Property, and NCRC has filed this condemnation

action and other related condemnation actions in an effort to seize Franco's Property, the

Combined Property and other portions of the Skyland Site, and is causing Franco other

immediate harm and losses in his business and is subjecting him to uncertainty, expense and loss

due to the threatened taking of his Property and the Combined Property. Unless said legislation

is declared unconstitutional and unlawful, and NCRC is temporarily, preliminarily and

9

permanently enjoined and restrained from implementing any such legislation or otherwise

attempting to acquire Franco's Property, the Combined Property or the Skyland Site or any part

thereof by eminent domain, Franco, who is suffering economic and other harm as a result of

NCRC's and D.C.'s' actions, will continue to suffer irreparable harm.

39. Upon information and belief, commencing some time prior to 2002, NCRC,

responding to the insistence of certain community activists, individuals and organizations, in the

Hillcrest area who wanted an improved Skyland Center containing new facilities such as a white

table cloth restaurant, a Starbucks coffee shop and a book store, became interested in

redeveloping the Skyland Center. At all relevant times the Skyland Center has been and now is a

privately owned, fully leased and operating, taxpaying and economically viable neighborhood

shopping center serving the needs of the Hillcrest and adjoining communities in Southeast

Washington, D.C.

40. Upon information and belief, in or about 2001 or in early 2002, NCRC solicited

expressions of interest or proposals from private developers interested in redeveloping the

Skyland Center in conjunction with NCRC. Upon information and belief, in making such

solicitation, NCRC did not prepare or provide any plan or comprehensive detailed scheme as to

what the redeveloped Skyland Center should be, but, instead, required the applicants to prepare

and provide such plans and data of how they would redevelop the Skyland Site.

41. In about May, 2002, NCRC selected the Redeveloper to redevelop the Skyland Site.

Thereafter, NCRC and the Redeveloper negotiated the JDA, covering the Skyland Project, which

was completed and executed in about September, 2002.

42. The JDA provided, among other things, that (a) the purchase price of the Skyland

10

Site would be the fair market value of that property in its "as is" condition as determined by

agreement of NCRC and the Redeveloper, (b) the Redeveloper would (i) prepare the

development plan for the Skyland Project, (ii) obtain a lease from an anchor retail non-grocery

tenant of at least 50,000 sq. ft., (iii) expend at least $100,000 in marketing and due diligence

costs through non-affiliated parties, (iv) enter into a development entity agreement with NCRC

whereby NCRC would receive a percentage of interest in the operating cash flow and capital

proceeds from the Skyland Project, and (v) be responsible for clearing the site and constructing

the new shopping center, and (c) defendant NCRC would be responsible for (i) acquiring the

Skyland Site, (ii) obtaining funding for its activities from D.C., and (iii) obtaining authorization

and/or approval by the NCRC's Board of Directors and the Council of NCRC's use of eminent

domain to acquire the Skyland Site.

43. The JDA also provided, in part, that the Redeveloper would post a deposit which

would become non-refundable upon defendant NCRC obtaining eminent domain authority or

acquiring the Skyland Site, and that closing on the purchase of the Skyland Site by the

Redeveloper (or its designee) had to occur by July 1, 2004.

44. Upon information and belief, NCRC had no responsibility under the JDA to prepare

any development plans for the Skyland Project, and at all relevant times neither NCRC or DC or

any other public agency prepared any such plans for the Skyland Project, the Skyland Site or the

neighboring area under the JDA or under authority of any law or regulation. The only plans for

the redevelopment of the Skyland Center and the Skyland Site were those prepared by the

Redeveloper for the Skyland Project.

45. Upon information and belief, neither the Skyland Project nor the JDA, nor the

11

undertakings of D.C. or NCRC or the Redeveloper to one another were in any respect contingent on the existence or finding of blight, slums or other similar conditions on the Skyland Site, other than any environmental remediation costs of the Skyland Site which might be encountered and which might prevent the parties from agreeing on the purchase price.

46. After execution of the JDA in 2002, D.C. and NCRC set about performing NCRC's undertakings under the JDA, including obtaining authority for NCRC from the Council to use eminent domain to acquire the Skyland Site.  At all times prior to the Skyland Legislation, hereinafter described, including at the time of entering into the JDA, NCRC lacked any such authority under the NCRC Act or any other law.  D.C. and NCRC proposed a series of enabling legislative acts to be enacted by the Council to provide NCRC such authority to acquire the Skyland Site by eminent domain to carry out its obligations to the Redeveloper under the JDA.

47. The first bill proposed as part of the Skyland Legislation is B15-752, entitled the "National Capital Revitalization Corporation Eminent Domain Clarification and Skyland Eminent Domain Approval Amendment Act of 2004" (the "Skyland Permanent Act"), which was introduced in the Council on March 3, 2004.  B15-752 would further amend the NCRC Act with regard to the exercise of NCRC's powers of eminent domain.  In addition, separately and in relevant part, B15-752 declared that, notwithstanding the foregoing amendments of the NCRC Act,  the Council finds that parcels comprising the Skyland Site "are necessary and desirable for the public use [and] approves the exercise of eminent domain by the National Capital Revitalization Corporation or the RLA Revitalization Corporation [of those properties]."  B15-752 did not specify any use for such properties, and did not state any basis for declaring them to be necessary and desirable for the public use.  The Council held a public hearing on B15-752, the

12

Skyland Permanent Act, on April 28, 2004.

48.  In a letter dated May 3, 2004, from Theodore N. Carter, President and Chief

Executive Officer of NCRC, to Councilmember Harold Brazil, Chairperson of the

Committee on Economic Development of the Council, confirming testimony he gave at the

April 28, 2004 public hearing, Mr. Carter stated:

> Second, the amendment ensures that the Skyland project can be undertaken in a
> timely manner. As I emphasized in my testimony, NCRC will not exercise eminent
> domain until there is a commitment from an anchor tenant. In addition, eminent
> domain may not ever be required depending upon the results of the negotiations
> conducted with the property owners. However, the existing legislation does not
> specify when the Council needs to approve the exercise of eminent domain. NCRC
> wanted the Council to authorize the redevelopment of the area and approve this
> project before acquisition of the Skyland parcels began, not after. We believe that
> advance approval for this authority will make it more likely that it will never be used.
> (Emphasis supplied)

No further action on B15-752 was taken until November 3, 2004 as alleged below.

49.  A second bill substantially identical to B15-752, B15-829, entitled the "National

Capital Revitalization Corporation Eminent Domain Clarification and Skyland Eminent

Domain Approval Emergency Amendment Act of 2004" ("First Skyland Emergency Act"),

was introduced May 4, 2004, one week after the public hearing on B15-752. This legislation

would authorize, on an emergency basis, defendant NCRC to exercise eminent domain over

the property at the Skyland Site.  Like B15-752, the First Skyland Emergency Act did not

specify any use for such properties, or any basis for declaring them to be necessary and

desirable for the public use.  Resolution 15-556, declaring the emergency, stated in part that

> (t)he emergency is that site control is a precursor to obtaining firm
> commitments from retailers, and in order for development to proceed on a timely
> basis, the NCRC needs to bring to the table all land owners to commence the
> negotiation process and also to show the commitment of the D.C. government to the
> project. (Emphasis supplied)

The First Skyland Emergency Act was introduced and passed by the Council on May 4, 2004 and was signed by the Mayor of D.C. on May 21, 2004.  It took effect on that date and expired 90 days later on August 19, 2004.

50.  A third substantially identical bill, B15-830, entitled the "National Capital Revitalization Corporation Eminent Domain Clarification and Skyland Eminent Domain Approval Temporary Amendment Act of 2004", was also introduced on May 4, 2004, the same day the First Skyland Emergency Act was introduced, and was passed by the Council and signed by the Mayor on June 23, 2004 as A15-460.  After the 30 day Congressional review period, it became law, L15-193, on September 30, 2004 (the "Skyland Temporary Act").  The Skyland Temporary Act had a duration of 225 days and expired May 13, 2005.  Like the first two measures, the Skyland Temporary Act did not specify the use for the properties to be taken or the basis for declaring it to be a public use.

51.  A fourth substantially identical bill, B15-952, entitled the "National Capital Revitalization Corporation Eminent Domain Clarification and Skyland Eminent Domain Approval Congressional Review Emergency Amendment Act of 2004", was introduced on July 12, 2004 and passed as an emergency measure on August 2, 2004 (the "Second Skyland Emergency Act").  Resolution 15-622, which declared the emergency on July 13, 2004, stated, in words virtually identical to those given in  Resolution 15-556, the first emergency declaration, that

> (t)he emergency circumstances exist because site control is a precursor to obtaining firm commitments from retailers.  In order for development to proceed in a timely manner, NCRC needs to bring to the table owners to commence the negotiation process.

As with the prior acts, the Second Skyland  Emergency Act also did not specify any purpose or justification as a public use. It took effect on that date, August 2, 2004, and expired on October 31, 2004.

52.  Upon information and belief, NCRC and D.C. intended that the Second Skyland Emergency Act be enacted because the Skyland Temporary Act would not take effect, if at all, until after the expiration of the First Skyland Emergency Act, and D.C. and NCRC wanted NCRC to continue its activities in furtherance of the Skyland Project in the meantime.  The First and Second Skyland Emergency Acts are essentially identical and the emergency declared for each is the same.

53.  B15-752, the Skyland Permanent Act, was revised by the Committee on Economic Development of the Council in substantial respects and was reported out of the Committee on November 3, 2004, during the term of the Skyland Temporary Act, but (a) more than six months after the public hearing on B15-752, and (b) after the expiration of the first and second Skyland Emergency Acts and (c) after certain events occurred as described below.  B15-752 was passed by the Council on December 7, 2004 and signed by the Mayor on December 29, 2004.  The Skyland Permanent Act, A15-679, became law, L15-286, on April 5, 2005, after the 30 day Congressional review period.

54.  NCRC and D.C. caused the Council to enact another legislative act closely related to, and at the same time as enactment of, the Skyland Permanent Act.  That act entitled the Skyland Site Acquisition Support Act of 2004, B15-944, (the "Skyland Support Act") was introduced on July 12, 2004 pursuant to letter dated July 9, 2004 from the Mayor to the Chairman of the Council.  The purpose of B15-944 was to authorize the Mayor to transfer up to $2,000,000 to

15

NCRC to pay the cost of acquiring certain parcels of property at the Skyland Center from property owners willing to negotiate such a sale to NCRC.

55. The Committee on Economic Development of the Council held a public roundtable on B15-944 on four days' public notice on October 26, 2004. Neither Franco nor any other property owner, tenant or merchant at the Skyland Center attended that public roundtable because of the lack of adequate notice. Upon information and belief, the only attendees were representatives of D.C.(including agents of the Mayor and the Council) and NCRC, the Redeveloper and the community supporting the measure, all of whom were given adequate notice of the roundtable. The Committee approved the measure on November 4, 2004, and it was passed by the Council on December 7, 2004 the same day as the Skyland Permanent Act. Thereafter, the Skyland Support Act became law, L15-302, effective April 8, 2005.

56. The foregoing five legislative actions relating to the Skyland Assemblage are collectively referred to as the Skyland Legislation. D.C. and NCRC conspired together to cause the enactment of the Skyland Legislation in the form and sequence alleged herein for the purpose of (a) enabling NCRC to commence actions leading to the acquisition of the Skyland Site and the carrying out of the redevelopment of the Skyland Center and the Skyland Project under the JDA at the earliest possible date without there being formal permanent legislation authorizing such actions in effect and without defendants having the requisite funding to undertake the Skyland Project, and (b) delaying enactment of B15-752, the Skyland Permanent Act, to the latest possible date in the Council Period ending December 31, 2004 so as to permit the Council to revise B15-752 in any manner, deemed appropriate, including the addition of the pretextual, false and baseless findings described herein below without giving any public notice of or conducting a

16

hearing on such substantially revised bill, to the latest date before enactment in that Council Period.

57. D.C. and NCRC further conspired together to cause the revision of B15-752, the Skyland Permanent Act shortly before it was approved by the Council's Committee on Economic Development in November, 2004 to insert certain findings by the Council, including, among other things, that the Skyland Center was a "blighting factor" in the community. Although, prior to B15-752, the NCRC Act already contained a definition of a "blighted area" in which area NCRC had authority to exercise the power of eminent domain, that authority was insufficient for NCRC to acquire the Skyland Site, and, at all relevant times, D.C. and NCRC understood it to be inadequate. Therefore, defendants caused the Council to revise B15-752 to contain certain legislative findings in a transparent and pretextual attempt to provide such authority to NCRC. Notwithstanding D.C. and NCRC's objectives, the legislative findings added to B15-752 by the Committee did not include any findings by the Council that either the Skyland Center or the Skyland Site is blighted or is a "blighted area" as defined by the NCRC Act, or that it otherwise qualified as an area to be taken by eminent domain under the NCRC Act or any other law.

58. Said legislative findings inserted by the Committee in B15-752 at the behest of D.C. and NCRC were and remain pretextual, wrong, inaccurate, baseless and substantially irrelevant. Among other things, Sec, 2(a)(12) added to B15-752 by the Committee which states that "The National Capitalization Revitalization Corporation ("Corporation") has advised the Council that the Skyland Center is blighted and that current conditions are an impediment to the economic revitalization of this area of the District" is false in that NCRC has admitted that it has made no findings, then current, that the Skyland Shopping Center is blighted, and has not made any such

17

blight finding since then.

59.  These findings were inserted at that late date solely in an attempt to give the Skyland Legislation a constitutional basis and distinguish it from certain similar economic development related eminent domain legislation enacted by New London, CT, the constitutionality of was then being reviewed by the U.S. Supreme Court in the case of <u>Kelo v. City of New London</u>, CT, No 04-108, and to attempt to provide a basis for sustaining the constitutionality of B15-752 under established case law, even if the taking in <u>Kelo</u> were held unconstitutional.  The Supreme Court granted *certiorari* in the <u>Kelo</u> case on September 28, 2004, and rendered its decision on June 23, 2005.

60.  Further, in an action filed July 13, 2004 and now pending before the United States District Court for the District of Columbia, <u>Rumber v. D.C.</u>, Civil No. 04-1170 RMU, plaintiffs in that action, certain other property owners and tenants at the Skyland Center, alerted D.C. and NCRC to the issues raised by the Skyland Legislation relating to the <u>Kelo</u> case, and to the defective vagueness of the Skyland Legislation.  The combination of those events caused D.C. through the Council to revise B15-752, the Skyland Permanent Act, as stated in paragraphs 57, 58 and 59 hereof, without giving public notice or conducting a public hearing on such revised measure and without affording Franco, other interested owners and tenants, or other members of the public an opportunity to comment upon the revised measure before it was presented to and enacted by the full Council in November and December, 2004.

61.  The timing and method of processing, revising and enacting B15-752, the Skyland Permanent Act, and B15-944, the Skyland Support Act, were intended by D.C. and NCRC to enable those measures to be enacted at the latest possible date (a) with the least possible

18

knowledge and participation of the public, especially the owners, merchants and tenants located

in the Skyland Site, and (b) without disrupting or delaying the actions of D.C. and NCRC in

undertaking to acquire the Skyland Site prior to receiving formal permanent legislative authority

and funding.

62. Upon information and belief, at no time relevant to this action, have D.C. or NCRC

or any agents thereof made any findings that the Skyland Site or the area of the District in which

it is located is blighted or otherwise eligible to be taken by eminent domain, or made or approved

any plans for the development or redevelopment of such areas to remedy any defective conditions

or to promote economic development.

63. In planning and taking the actions alleged in this counterclaim, D.C. and NCRC

knew that such revisions of B15-752 and the enactment of B15-944 would be opposed by the

persons and entities who would be directly and adversely affected by those actions, including

Franco, the plaintiffs in Rumber v. D.C., the other owners, merchants and tenants in the Skyland

Site, and the numerous members of the community who value the existing Skyland Center and

oppose the Skyland Project. In taking these actions, D.C. and NCRC intentionally sought to

deprive Franco of his constitutional rights as alleged herein.

64. In furtherance of the Skyland Project and the Skyland Legislation, on May 17, 2004,

the Mayor transmitted to the Council two proposed resolutions, one which would authorize the

creation of a "Retail Priority TIF Area" to support the redevelopment of over 200,000 square feet

of retail activity known as the Skyland Project (PR15-860) and the second to authorize D.C. to

apply to the U.S. Department of Housing and Urban Development ("HUD") for funds to enable

NCRC to acquire the Skyland Site (PR15-861). After the Council's Committee on Economic

19

Development and Committee on Finance and Revenue conducted a joint public roundtable on June 17, 2004, both resolutions were passed by the Council on July 13, 2004 as R15-619 and R15-602 respectively. Such measures are critical to enabling NCRC to acquire the Skyland Site and carry out the Skyland Project. Upon information and belief, as of the date of this condemnation action, the Retail Priority TIF Area has not been created, and HUD has not provided any such funds.

65. The Redeveloper, in cooperation with NCRC and D.C., testified at the joint public roundtable in support of said resolutions, and similarly gave testimony in support of the Skyland Legislation while it was being considered by the Council and its Committees prior to adoption.

66. Upon information and belief, the cost to D.C. and NCRC to carry out NCRC's responsibilities with respect to the Skyland Project, including, among other things, land assembly, site preparation and business relocation, will substantially exceed $48 million, the amount NCRC estimated for the Council in February, 2005. Upon information and belief, NCRC intends to sell the Skyland Site to the private Redeveloper for about $5 million, representing more than a $25 million writedown in the value of the Skyland Site. Upon information and belief, D.C. and NCRC do not yet have the funds need to carry out the Skyland Project, and lack in excess of $13 million in such needed funds. NCRC demonstrated its lack of funds to acquire the Property, the Combined Property and the other properties in the Skyland Site by not filing a declaration of taking under D.C. Code Sec. 16-1314 (2005) as amended in this or any other related condemnation action.

67. By letter dated February 22, 2005, NCRC offered to purchase Franco's Property. Upon information and belief, NCRC sent similar letters to the other Skyland Site owners on the

same date. By subsequent letters dated April 15, 2005 and April 28, 2005, NCRC invited Franco

to exchange his interest in the Property for shares in a limited liability company that would be

organized and controlled by defendant NCRC (the "Skyland LLC Proposal"). Upon information

and belief, one of the motivations for NCRC's offer is that it lacks the funds to acquire the entire

Skyland Site by eminent domain.

68. NCRC said in its letter of April 28, 2005 that unless by May 13, 2005 Franco agrees

to sell his property to NCRC or commits to exchange his property ownership for shares in the

Skyland LLC that NCRC is preparing to commence eminent domain proceedings against

Franco's Property by May 31, 2005. On May 6, 2005, NCRC told a group of Skyland Site

owners and representatives, including Franco's attorney, that it lacked the funds to acquire the

Skyland Site by eminent domain and that there was no anchor tenant commitment.

69. NCRC has refused Franco's D.C. Freedom of Information Act requests to provide

Franco any information or correspondence between NCRC or the Redeveloper and potential

tenants including anchor or "big box" tenants such as Target or Shoppers Food Warehouse.

70. Upon information and belief, NCRC further has informed Skyland Site property

owners in May and June, 2005 that any venture such as the Skyland LLC or any other venture to

redevelop the Skyland Center including any of the Skyland Site owners must also include NCRC

and the Redeveloper or its principals.

71. Upon information and belief, following selection of the Redeveloper in May, 2002,

NCRC failed and refused to discuss or negotiate with any Skyland Site owner regarding the

redevelopment of the Skyland Center or the Skyland Site, despite said owners' repeated requests.

72. Upon information and belief, as of July 1, 2004 and at all times thereafter, the JDA

has been terminated or NCRC and the Redeveloper each have had the right to terminate the JDA.

73. Plaintiffs' Property is property that may not be taken except for a public use and on payment of just compensation under the Fifth Amendment of the U.S. Constitution.

74. The First and Second Skyland Emergency Acts, the Skyland Temporary Act and the Skyland Permanent Act all would authorize NCRC to take Franco's Property by eminent domain solely for a private and non-public use, *i.e.* redevelopment of the existing Skyland Shopping Center as a shopping center by a private entity, the Redeveloper, for its own primary benefit.

75. As such, the taking of the Skyland Site would be an assemblage of the Skyland Site for redevelopment by the Redeveloper, a private entity, in a purely private one to one transaction with another private party with NCRC acting as the surrogate for the private party owner-sellers, through the use of NCRC's eminent domain authority.

76. The actual non-pretextual purpose of the Skyland Legislation is to confer a benefit on a private party by enabling a private entity, the Redeveloper, to acquire the Skyland Site owned by other private parties, the current Skyland Site owners, over their objection, by the use of NCRC's eminent domain authority, in a one to one private transaction, and outside the confines of any comprehensive or other publicly considered and approved development plan for the Skyland Site or the area in which it is located, which property would be redeveloped by the private entity purchaser, the Redeveloper, for its own primary benefit, with defendant NCRC sharing in certain economic and financial benefits of the Skyland Project, the private undertaking, all of which is for an illegitimate purpose and of the type characterized as an impermissible taking by the U.S. Supreme Court in its recent decision in Kelo v. City of New London. None of the purposes or objectives of D.C. or NCRC in undertaking the Skyland

22

Project or enacting the Skyland Legislation constitutes a public use or public purpose within the meaning of the Fifth Amendment.

77. At all relevant times neither the Property nor any other properties in the Skyland Site has been or now is a slum area or blighted area or otherwise eligible for the exercise of the power of eminent domain by NCRC under the NCRC Act as amended, the Skyland Legislation or any other applicable law.

78. Notwithstanding the foregoing, the Council inserted false, unfounded, irrelevant and pretextual findings in the Skyland Permanent Act in a wrongful, irrational and arbitrary attempt to justify the exercise of eminent domain on the alleged grounds that the Skyland Center is blighted and that the Skyland Site is otherwise eligible to be taken as a public use by the exercise of the power of eminent domain.

79. In seeking to take Franco's Property and the Combined Property under the Skyland Legislation, NCRC is violating Franco's rights under 42 U.S.C. §1983, as amended, and is threatening to violate Franco's rights under the Fifth Amendment as stated herein. Unless, NCRC is temporarily, preliminarily and permanently enjoined and restrained from taking such action, Franco will suffer irreparable harm to his unique and valuable leasehold and fee ownership property interests without just compensation, and will be forced to relocate his business from the Skyland Center which he would only be able to accomplish, if at all, at great cost and at a great loss of business and money.

## SECOND COUNTERCLAIM

(Taking In Violation of the Public Use Provisions of the Fifth Amendment
of the U.S. Constitution-Vagueness and Ambiguity)

80. Defendant-counterplaintiff Franco repeat the allegations in paragraphs 24 through 79

hereof.

81. The Skyland Permanent Act amends the NCRC Act in certain respects governing the powers of eminent domain that defendant NCRC may exercise. Among other things, the Skyland Permanent Act adds a definition of a "project area" and a "slum area" to the NCRC Act, both being areas in which NCRC has authority to exercise eminent domain powers under the NCRC Act. However, the Skyland Permanent Act does not describe, designate or define the Skyland Site as a "project area", "slum area", "blighted area" or any of the other enumerated areas in which NCRC is authorized to exercise eminent domain powers under the NCRC Act. Instead, the Skyland Permanent Act expressly ignores those defined terms and areas, and the criteria and standards which those areas require for the exercise of eminent domain under the NCRC Act, and merely states that NCRC is authorized to exercise eminent domain over the Skyland Site.

82. Moreover, the Skyland Permanent Act does not state the public purpose or use for which the Skyland Site is to be acquired, or what use is to be made of the Skyland Site, what standards or requirements govern NCRC in acquiring, using or disposing of the Skyland Site or that NCRC is subject to further review or approval by the Council before it may exercise eminent domain powers over the Skyland Site.

83. Further, section 3(c) of the Skyland Permanent Act, which adds a new section 20(c) to the NCRC Act creates in subsections (2) and (3) thereof an ambiguity and contradiction in the NCRC Act in that subsections (2) and (3) added by the new legislation authorize NCRC or its subsidiary, the RLA Revitalization Corporation ("RLA"), to commence eminent domain proceedings in their separate names under the NCRC Act without further recourse to or approval by the Council, whereas section 20(a) of the NCRC Act, which in relevant part is not amended

24

by the Skyland Legislation, permits only NCRC to bring such eminent domain proceedings in its own name, not in the name of RLA, and requires to obtain Council approval before commencing such eminent domain proceeds.

84. Thus, the Skyland Legislation permits NCRC or RLA to exercise eminent domain over the Skyland Site without any standards or requirements whatsoever, and without further Council review or approval. In doing so, the Skyland Legislation is impermissibly vague as to the purpose or use for which and manner in which NCRC or RLA may exercise the power of eminent domain as to the Skyland Site.

85. Further, the Skyland Legislation is impermissibly ambiguous and contradictory as to the entity that may exercise eminent domain proceedings over the Skyland Site or any other property in the District of Columbia under the NCRC Act, as section 20(a) of the NCRC Act limits that authority to NCRC, and requires it to obtain Council approval before it may commence eminent domain proceedings, whereas section 20(c) of that Act would authorize either NCRC or RLA to conduct such proceedings in its own name and without any further Council review or approval.

86. Franco repeats the allegations in paragraph 79 of this answer and counterclaim.

## THIRD COUNTERCLAIM

(Deprivation of Property in Violation of the Due Process Provisions
of the Fifth Amendment of the U.S. Constitution)

87. Franco repeat the allegations in paragraphs 24 through 86 hereof.

88. Upon information and belief, one of the conditions set or relied on by the Council for the enactment of the Skyland Permanent Act, was the commitment of NCRC that it or the Redeveloper would have a commitment from an anchor retail (non-grocery) tenant, such as a

Target department store, to lease space and establish a significant retail operation at the redeveloped Skyland Center before NCRC would initiate any eminent domain proceedings under that act.

89. Upon information and belief, there are no legal commitments between NCRC and its Redeveloper regarding the Skyland Project as of the date of this answer and counterclaim.

90. Notwithstanding the foregoing, NCRC has commenced this condemnation action and other similar condemnation proceedings against the Combined Property and other properties in the Skyland Site, but neither NCRC nor its proposed private redeveloper, the Redeveloper, has a commitment from such an anchor tenant satisfying the commitment made by NCRC to the Council as a condition precedent for the enactment of the Skyland Permanent Act, or the exercise of the power of eminent domain thereunder..

91. As a member of the class of persons and entities whose property would be acquired and who would be displaced by NCRC or RLA in carrying out eminent domain proceedings for the Property or other properties in the Skyland Site, Franco will be deprived of his valuable and unique property without due process of law if NCRC were to proceed without there being such a commitment.

92. The failure of NCRC or the Redeveloper to have such an anchor tenant commitment before proceeding, and the failure of Council to insist on the satisfaction of such condition before NCRC commended this eminent domain proceedings under the Skyland Permanent Act constitute a violation of Franco's due process rights and an unlawful deprivation of Franco's Property without due process of law under the Fifth Amendment of the U.S. Constitution.

93. Franco repeat the allegations in paragraph 79 of this answer and counterclaim.

26

FOURTH COUNTERCLAIM

(Violation of D.C. Home Rule Act and Council Rules - Lack of Public Notice
of Council's Intent to adopt Skyland Permanent Act)

94.  Franco repeats the allegations in paragraphs 24 through 93 hereof.

95.  Upon information and belief, B15-752, prior to enactment as the Skyland Permanent

Act, was improperly revised by the Council, in violation of the D.C. Home Rule Act and the

Council's rules of procedure in the months after the enactment and expiration of the First and

Second Skyland Emergency Acts and after the enactment and effectiveness of the Skyland

Temporary Act, to include certain pretextual, wrong, inaccurate, baseless and irrelevant

legislative findings by the Council, and to permit, without explanation, RLA to bring such

eminent domain proceedings in place of NCRC.  Council or an appropriate committee thereof

should have conducted a public hearing on said revisions of B15-752 on notice before B15-752

was so revised, considered and enacted as the Skyland Permanent Act by the Council.  By these

actions, D.C. and NCRC prevented Franco and others similarly situated from protesting such

revisions and refuting such pretextual legislative findings, and thereby deprived Franco, others

similarly situated and other interested members fo the public from protesting such revisions to

the Council before enactment of the Skyland Permanent Act.

96.  The failure of the Council to conduct such a public hearing on notice constitutes a

violation of the D.C. Home Rule Act, Sec. 1-204.04 and Council Rule 422, and violates Franco's

and the public's right to receive due notice of such intended revisions of B15-752 and to

comment thereon or object thereto before the Council acted on that measure.

97.  As a result of the foregoing, Franco has suffered economic harm and injury and have

been threatened with the taking of his Property without just compensation or due process of law

in violation of his U.S. constitutional rights and has suffered other harm and losses for all of which NCRC is liable to Franco under 42 U.S.C. §1983.

## FIFTH COUNTERCLAIM

(Violation of the D.C. Home Rule Act - Duplicate Emergency Acts)

98. Franco repeats the allegations in paragraphs 24 through 97 hereof.

99. In enacting the Second Skyland Emergency Act, D.C., through the Council and the Mayor, encouraged by NCRC, violated D.C. Code Sec. 1-204.12 of the District of Columbia Home Rule Act, which does not permit enactment of more than one identical emergency measure based on the same emergency circumstances under the circumstances present in this action, which were not merely intended to maintain the status quo pending approval and Congressional review of pending legislation, namely the Skyland Temporary Act or the Skyland Permanent Act, but also to permit NCRC to continue to take actions to carry out the Skyland Project, which were the objectives of the Skyland Temporary Act and the Skyland Permanent Act, in part as an alternative to that pending legislation.

100. D.C. and NCRC wrongfully caused the Council to enact and the Mayor to sign the Second Skyland Emergency Act on August 2, 2004, and it ostensibly became effective on that date and expired on October 31, 2004.

101. But for the Second Skyland Emergency Act becoming effective on August 2, 2004, there was no statutory authority for NCRC to take any actions or expend or commit any funds concerning the Skyland Project or the Skyland Site during the period beginning August 19, 2004 when the First Skyland Emergency Act expired and ending September 30, 2004 when the Skyland Temporary Act became effective.

28

102. Because of such lack of authority, each and every act, expenditure of funds and commitment by NCRC or any of its agents or contractors with respect to the Skyland Project or the Skyland Site during the period beginning August 2, 2004 and ending September 30, 2004 was *ultra vires* and of no force or effect. Such *ultra vires* and nugatory actions included, among other things, obtaining appraisals of Franco's Property and that of other Skyland Site property owners.

103. As a result of the foregoing, Franco has suffered economic harm and injury and have been threatened with the taking of his Property without just compensation or due process of law in violation of his U.S. constitutional rights and has suffered other harm and losses for all of which NCRC is liable to Franco under 42 U.S.C. §1983.

104. Franco repeats the allegations in paragraph 79 of this answer and counterclaim.

## SIXTH COUNTERCLAIM

(Violation of the D.C. Home Rule Act - No Emergency)

105. Franco repeats the allegations in paragraphs 24 through 104 of this answer and counterclaim.

106. Section 412, entitled "Emergency Legislation" of "Rules for the Council of the District of Columbia, Council Period XV Resolution of 2003"Council (the "Council Rules") states the circumstances when the Council may consider and act on a bill due to emergency circumstances and subsection (b) thereof states that

an "emergency" means a situation that adversely affects the health, safety, welfare, or economic well-being of a person for which legislative relief is deemed appropriate and necessary by the Council, and for which adherence to the ordinary legislative process would result in delay that would adversely affect the person whom the legislation is intended to protect.

107. Upon information and belief, the ostensible need to commence the negotiation

29

process with the Skyland Site owners, given as the emergency in emergency declarations

Resolutions 15-556 and 15-622, and the need to show the commitment of D.C. to the Skyland

Project, given as an additional justification in Resolution 15-566, and, generally, the

implementation of the Skyland Legislation, the acquisition of the Skyland Site and the carrying

out of the Skyland Project, could not be undertaken until (a) at least the Skyland Permanent Act

was in full force and effect, and (b) D.C. and NCRC had the funds necessary to carry out

acquisition of the Skyland Site and to undertake the Skyland Project. Upon information and

belief, D.C. and NCRC knew and understood those facts at all relevant times.

108. B15-752 could have been enacted by the Council, signed by the Mayor and

submitted for 30 day Congressional review as early as June, 2004. Passing such Congressional

review, B15-752, the Skyland Permanent Act, could have become law in September, 2004, seven

months before it actually became law.

109. Upon information and belief, at all relevant times D.C. and NCRC planned to and

did delay enactment of the Skyland Permanent Act to the latest possible date in Council Period

XV to avoid opposition to and unfavorable criticism of the Skyland Permanent Act and the

Skyland Project and to permit revisions to B15-752, among other things, to attempt to remedy

any perceived defects to the greatest extent possible.

110. Upon information and belief, the power to exercise eminent domain with regard to

the Skyland Site or to commence negotiations with the Skyland Site owners or to show D.C.'s

commitment to the project were not needed by NCRC on an emergency basis within the meaning

of Section 412 of the Council's Rules at the time of Resolutions 15-556 and 15-622 or at any

other time. Upon information and belief, D.C. and NCRC knew and understood those facts at all

relevant times.

111.  There was no "emergency" within the meaning of Sec. 412 of the Council Rules at the time of Resolutions 15-556 and 15-622 with respect to First and Second Skyland Emergency Acts; and, thus, under Rule 413 of the Council Rules, there was no basis for the introduction or enactment of the Skyland Temporary Act.  Upon information and belief, as of the date of this complaint, defendant NCRC still has not acquired any property in the Skyland Site.

112.  But for the First and Second Skyland Emergency Acts and the Skyland Temporary Act becoming effective as early as May 21, 2004, there was no statutory authority for NCRC to take any actions or expend or commit any funds concerning the Skyland Project or the Skyland Site during the period beginning May 21, 2004 and ending April 5, 2005 when the Skyland Permanent became effective.

113.  As a result of the foregoing, the First and Second Skyland Emergency Acts and the Temporary Act were impermissibly and arbitrarily, irrationally and capriciously enacted by D.C. and implemented by NCRC.

114.  Franco repeats the allegations in paragraphs 103 and 104 of this answer and counterclaim.

WHEREFORE, defendant Franco requests judgment against plaintiff as follows:

(i)  Dismissing the complaint with prejudice;

(ii)  On the First and Second Counterclaims, declaratory judgment that the Skyland Legislation is unconstitutional and in violation of the Takings Clause of the Fifth Amendment of the United States Constitution and 42 U.S.C. §1983;

(iii)  On the Third Counterclaim, declaratory judgment that the Skyland Legislation is

31

unconstitutional and in violation of the Takings Clause of the Fifth Amendment of the United

States Constitution and the Due Process Clause of the Fifth Amendment and 42 U.S.C. §1983;

(iv) On the Fourth Counterclaim, declaratory judgment that the Skyland Permanent Act

was enacted in violation of the D.C. Home Rule Act and the Council Rules and is null and void

and of no force and effect, and that all actions and commitments of NCRC and its contractors and

agents in undertaking the Skyland Project during the period from April 5, 2005 to the entry of

judgment in this action are null and void and of no force and effect;

(v) On the Fifth Counterclaim, declaratory judgment that the Second Skyland Emergency

Act was enacted in violation of the D.C. Home Rule Act and is null and void and of no force and

effect, and that all actions and commitments of NCRC and its contractors and agents in

undertaking the Skyland Project during the period from August 19, 2004 until September 30,

2004 are null and void and of no force and effect;

(vi) On the Sixth Counterclaim, declaratory judgment that the First and Second Skyland

Emergency Acts and the Skyland Temporary Act were enacted in violation of the D.C. Home

Rule Act and are null and void and of no force and effect, and that all actions and commitments

of NCRC and its contractors and agents in undertaking the Skyland Project during the period

May 21, 2004 through April 5, 2005 are null and void and of no force and effect;

(vii) On all Counterclaims, temporary, preliminary and permanent injunctions against

NCRC enjoining and restraining it from taking any action to implement the Skyland Legislation

or to acquire the Property, the Combined Property or any property interests in the Skyland Site or

to otherwise take any action in furtherance of the Skyland Project, and affirmatively requiring

NCRC to restore the *status quo ante* with regard to the ownership of the Skyland Site;

32

(viii) On all Counterclaims, granting defendant Franco damages under 42 U.S.C. §1983 for the losses, expenses and harm he has suffered as a result of the actions of D.C. and NCRC in enacting the Skyland Legislation and as a result of NCRC's actions and efforts to acquire the Property and the Combined Property and to initiate and carry out the Skyland Project in such amounts in excess of $1,000,000 as may be proved at the trial of this action;

(ix) Granting defendant Franco reasonable attorneys fees and expenses and the costs of this action; and

(x) Granting defendant Franco such other and further relief as the Court may deem just and proper.

> Ralph Werner
> D.C. Bar No. 88161
> 1020 Nineteenth Street, NW,
> Suite 400
> Washington, D.C. 20036
> (202) 331-8940
> (202) 331-8943 (Fax)
> Attorney for Defendant Samuel N. Franco

<u>JURY DEMAND</u>

Defendant Franco (as defendant and defendant-counterplaintiff) demands a trial by jury on all issues in this action that may be tried by a jury.

> Ralph Werner
> D.C. Bar No. 88161
> 1020 Nineteenth Street, NW,
> Suite 400
> Washington, D.C. 20036
> (202) 331-8940
> (202) 331-8943 (Fax)
> Attorney for Defendant Samuel N. Franco

33

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing answer and counterclaim of defendant Samuel N. France was served by first class mail, postage prepaid, this 8th day of August, 2005 on Paul J. Kieran, Esq., Holland & Knight LLP, 2099 Pennsylvania Avenue, NW, Suite 100, Washington, DC 20036, and on Barbara Liester, Vice-President, PNC. Bank, N.A., successor to National Bank of Washington, 1919 Pennsylvania Avenue, NW, Washington, DC 20006.

Ralph Werner

34